# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 16-0235-WS** |
| | ) | |
| **JOEL VAZQUEZ LOPEZ,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

This matter comes before the Court on the Motion to Suppress (doc. 30) filed by defendant Joel Vazquez Lopez.  The Motion has been briefed and is now ripe.  The Court has reviewed the parties' legal memoranda, the written report prepared by Deputy Jason Kolbe of the Baldwin County Sheriff's Office, a 37-minute recording of the traffic stop from Deputy Kolbe's body camera, several other video recordings, and all other portions of the file deemed relevant.[1]

---

[1]       Lopez has requested an evidentiary hearing.  However, it is settled law that "[w]here a defendant in a motion to suppress fails to allege facts that if proved would require the grant of relief, the law does not require that the district court hold a hearing independent of the trial to receive evidence on any issue necessary to the determination of the motion."  *United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000) (citation omitted); *see also United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985) (district court "may refuse a defendant's request for a suppression hearing … if the defendant fails to allege facts that, if proved, would require the grant of relief").  Lopez's Motion to Suppress neither disputes the veracity of key facts alleged by the Government (the vast majority of which are confirmed by the recording from Deputy Kolbe's body camera) nor supplies a specific alternative factual narrative that, if proved, would entitle him to relief.  Rather, the Motion to Suppress is rooted in Lopez's interpretation of essentially uncontroverted facts, and his application of such facts to established law.  No hearing is needed because the Motion thus turns on questions of law, as opposed to disputed issues of fact that require resolution via evidentiary hearing.  *See, e.g., United States v. Horne*, 2006 WL 2668919, *5 (11th Cir. Sept. 18, 2006) (district court properly decided motions to suppress without a hearing because "Horne's motions presented issues of law, not fact," and "[n]either motion raised a disputed issue of fact that required resolution in an evidentiary hearing").  Accordingly, Lopez's request for hearing is **denied**.

## I.     Background Facts.

The facts relevant to the Motion to Suppress are uncontested in material respects and are drawn in large part from a video recording of the incident, as well as a written police report prepared by the lead officer the next day.[2]

At approximately 10:30 a.m. on September 19, 2016, Deputy Kolbe's patrol vehicle was stationary on I-10 near mile marker 51 in Baldwin County, Alabama.  A white Nissan Altima traveling eastbound attracted his attention.  The vehicle slowed markedly as it approached his location to a speed well below the posted limit, then failed to maintain its lane on two occasions. Deputy Kolbe followed the Altima and observed its occupants behaving in a manner that raised suspicion (*i.e.*, the female driver was stiff and appeared "overly aware" of the officer's presence, the male passenger was watching the police vehicle in his rearview mirror and leaning back in his seat in an apparent attempt to avoid being seen).  (Report, at 2.)  Deputy Kolbe also observed an electronic device (either a GPS or a cell phone) "mounted high in the center of the front windshield that appeared to be obstructing the view of the driver."  (*Id.*)  The video clearly depicts a full-size cell phone or GPS device affixed to the center of the Altima's front windshield, a few inches below the rearview mirror.

Deputy Kolbe initiated a traffic stop of the white Altima near mile marker 57.  The stated justification for the stop was that the front windshield was obstructed, in violation of Alabama law.  Upon making the stop, Deputy Kolbe exited his patrol vehicle, activated his body camera, and approached the Altima on the passenger side.  He greeted the occupants, Joel Vazquez Lopez and co-defendant Kellie Marie Truitt, and asked who owned the car.  When Truitt responded that it was a rental, Deputy Kolbe asked if it came with the device mounted on the windshield.  Defendants responded negatively.  Deputy Kolbe then said, "Well, let me tell you

---

[2]     The Government did not file copies of the recording or the police report with the Clerk of Court; however, on January 11, 2017, the Government's counsel hand-delivered to chambers a CD containing a video file of the body camera footage, several other video recordings of the incident, and a PDF file of the subject report.  The Government referenced these materials in its Response (doc. 37) to the Motion to Suppress, and specifically indicated that the video files and police report "were previously provided to Lopez in discovery."  (Doc. 37, at 1.)  On that basis, the Court has reviewed the contents of the CD in adjudicating this Motion.  To ensure completeness of the record, the Clerk of Court is **directed** to maintain the CD as part of the court file in this matter, and to make an appropriate notion in the docket sheet.

why I stopped you.  It has to do with that right there.  In the state of Alabama, you're not allowed to have anything mounted to the front windshield of your car that can obstruct the windshield." Truitt laughed and quickly indicated that it was her GPS.  Deputy Kolbe then explained, "You may not realize this, but when you have something that's about five inches – which is about the size of that phone – and you're looking outside your window, it actually cuts out 15 feet of your view, so if you're making a lane change, you may possibly not see a car, so that's why we're really big on it."  Truitt said she felt like an "idiot," and Deputy Kolbe indicated there were other places she could place the GPS that would not obstruct the windshield.

During this exchange, Deputy Kolbe's suspicions were heightened by the defendants' mannerisms and behavior.  Lopez, who was in the passenger seat closest to Deputy Kolbe, appeared nervous, was breathing heavily and did not make eye contact.  Truitt, who was in the driver's seat, also exhibited signs of nervousness, in her over-animated patterns of speech (which are discernable on the video), her heavy breathing, and her carotid artery pulsating on her neck. When Deputy Kolbe asked to see the car rental agreement, Truitt's hands trembled as she handed the paperwork to him.  Lopez's identification showed a residence in Miami, Florida, while Truitt's identification showed a residence in Winter Park, Florida, several hours' drive away from Miami.  Defendants confirmed those cities of residence to Deputy Kolbe.  Curiously, the rental car agreement reflected that Truitt had rented the vehicle at Ontario International Airport in California four days earlier, and that the Altima was due to be returned to the same location on September 28, 2016, just nine days hence.

Determining that these circumstances warranted further investigation, Deputy Kolbe invited Truitt to step out of the Altima and speak with him.  She agreed.  Truitt's responses to benign questions about the pair's travel itinerary did nothing to assuage Deputy Kolbe's concerns.  To the contrary, Truitt said she had flown to California on vacation a week and a half earlier, that Lopez (whom she identified as her boyfriend) had flown to California before she did, that they were planning to move out to California so they were "looking around," and that they were driving back to Florida because it was "cheaper" than flying (even though Truitt indicated that Lopez worked for Southwest Airlines).  Deputy Kolbe noticed that Truitt appeared quite nervous throughout this discussion.

Just over five minutes after initiating the traffic stop, Deputy Kolbe invited Truitt to sit in the passenger seat of his patrol vehicle.  She did so.  At that time, Deputy Kolbe asked follow-up

questions to try to make sense of her story.  Truitt explained that she had driven from one airport to another in California to exchange rental cars because the car she had been issued originally was a "midsize" (just like the Altima) that was too small.  Truitt indicated that she and Lopez were going to drive the Altima back to California to turn it in, which prompted Deputy Kolbe to ask in an incredulous tone of voice, "Well, then what the hell are you going to Florida for?"  Truitt said that she had to work at her job as a waitress for a Disney resort restaurant, but that they were going to return the vehicle to California the following week because they were "still looking for a place to possibly move out there."  She rationalized that she did not want to miss work in the interim in case they did not find something (*i.e.*, in case they decided not to move).  Not surprisingly, Deputy Kolbe concluded that this story did not add up, so he extended the stop further to investigate.  He ran both suspects' licenses, and then walked over to the Altima to ask questions of Lopez.  For his part, Lopez indicated that the purpose of the California trip was "just have a fun vacation," and said he wanted to move out there.  Lopez said they were driving home to Florida because it was "so expensive to fly," elaborating that even though he could fly back for free, it would have cost $600 for Truitt's airplane ticket.  This explanation struck Deputy Kolbe as nonsensical, because the rental agreement reflected a charge of $546 for the vehicle, exclusive of gasoline, meals and hotel accommodations.  Lopez also could not describe what the two of them had done in California, saying only in the vaguest of terms that they had gone to San Diego.  In direct contradiction to Truitt's narrative, Lopez informed Deputy Kolbe that he did not know when they would go back to California, and that Truitt did not need to return to work until the following week.

By now, Deputy Kolbe was confronted with conflicting stories that, individually and collectively, defied common sense and reason.  He had accumulated substantial observations of their suspicious behavior, beginning before he initiated the traffic stop and extending through the signs of acute nervousness that they displayed upon questioning.  At the 12-minute mark of the video, Deputy Kolbe asked Lopez directly if there were drugs in the car.  He said no, and offered to allow Deputy Kolbe to search the contents of a large cooler in the back seat.  Deputy Kolbe then left Lopez and conferred with his partner, Officer McElroy.  The two officers recounted the many suspicious circumstances (*i.e.*, flying separately to California for "vacation," inability to say what they did in California, exchange of a rental car for a similar-size vehicle ostensibly because the first car was not big enough, obligation to return the rental car in California the next

week, and Truitt being a "nervous wreck").  Deputy Kolbe said to Officer McElroy, "Let's get this over with," and went back to the patrol car to speak with Truitt.  At this time, 14 minutes had elapsed since the traffic stop began.

Deputy Kolbe told Truitt, "it don't make no damned sense" why they did not fly back to Florida, particularly because the rental car cost nearly as much as a plane ticket.  Truitt tried to blame Lopez, admitting that he could have flown to Florida for free and attributing the decision to drive to his stubbornness and her speculation that Lopez did not like to fly anymore.  At the 16-minute mark, Deputy Kolbe informed Truitt he was going to write her a warning, not a ticket, for the windshield violation.  Despite this announcement, Truitt's nervous behavior did not abate; indeed, Deputy Kolbe observed her continuing to rub her face, breathe heavily, laugh nervously and talk excessively.  When Deputy Kolbe asked what they had done in California, Truitt said they had gone to Mexico; however, she could not offer any particulars as to their Mexican visit, except to explain that their reason for going was that she "had never been." Deputy Kolbe asked how many days they had spent in California.  Truitt appeared unable to answer, instead deflecting with a story about touching seals.  She said they had not visited anyone, then admitted they had visited a realtor and Lopez's cousin, whom she did not like and whose name she did not know.  She also could not identify the hotels where they had stayed.

At the 20-minute mark, Deputy Kolbe asked Truitt directly what was in the trunk of that vehicle, and whether there were firearms, controlled substances or anything hidden in the car that he needed to know about.  She answered negatively, insisting, "We just have our luggage." Deputy Kolbe finished printing out the warning citation and handed it to Truitt.  At that point, he asked, "You mind if I search your car?"  Truitt said that she did mind.  So Deputy Kolbe explained that he was going to run his K-9 unit around the Altima.  When Truitt asked why, he responded, "You want me to be honest with you?  I think you're hauling drugs. … I think y'all got a load of drugs in that car."  Truitt said she did not see why Deputy Kolbe needed to have the K-9 unit sniff for drugs.  Deputy Kolbe replied, "I have more than enough reasonable suspicion to hold the vehicle and you."

After removing Lopez from the Altima and patting him down, Deputy Kolbe asked him what was in the trunk of the vehicle.  Lopez said it was just their clothes.  Deputy Kolbe notified Lopez that he was going to run his dog because he thought they were hauling drugs, based on their behavior, implausible travel itinerary and other circumstances.  Deputy Kolbe retrieved his

K-9 unit Aron (an 8-year old Belgian Malinois) from the back of his patrol vehicle at the 24-minute mark of the video.  Aron alerted vigorously near the rear of the Altima, prompting Deputy Kolbe to comment to his partner, "It don't get much more solid alert than that."  In their ensuing search of the Altima, the officers discovered contraband items – later identified to be kilogram-sized bundles of cocaine – stuffed in the void between panels of the rear passenger doors.  Both defendants were placed under arrest, handcuffed, and given *Miranda* warnings.  On November 22, 2016, an Indictment (doc. 1) filed in this District Court charged Lopez and Truitt with conspiracy to distribute and to possess with intent to distribute approximately three kilograms of cocaine and one kilogram of heroin, all in violation of 21 U.S.C. § 846.

## II.    Analysis.

In his Motion to Suppress, Lopez challenges the constitutionality of the traffic stop, seizure, detention and vehicle search on multiple grounds.  His primary arguments are that the stop violated the Fourth Amendment at its inception and that its duration was excessive, pursuant to *Rodriguez v. United States*, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015).

### A.    Legality of the Traffic Stop.

It is well-settled that "[a] traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment."  *Heien v. North Carolina*, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014).  As a general proposition, a traffic stop comports with the Fourth Amendment "where the police have probable cause to believe that a traffic violation has occurred."  *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *see also Navarette v. California*, 134 S.Ct. 1683, 1687, 188 L.Ed.2d 680 (2014) ("The Fourth Amendment permits brief investigative stops – such as the traffic stop in this case – when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity.") (citations and internal quotation marks omitted).

The record reflects that Deputy Kolbe initiated a traffic stop of the vehicle in which Lopez was a passenger because he observed a GPS device mounted high in the center of the front windshield in a manner that obstructed the driver's view.  An Alabama statute provides as follows: "No person shall drive any motor vehicle with any sign, poster, or other nontransparent material upon the front windshield … of such vehicle which obstructs the driver's clear view of the highway or any intersecting highway."  Ala. Code § 32-5-215(a).  It is uncontroverted that a

cell phone or GPS device was mounted to the windshield of the Altima when Deputy Kolbe initiated the traffic stop. It is also beyond dispute that the device was positioned in a way that it obstructed the view of the driver (Truitt). On its face, such a device constituted "nontransparent material upon the front windshield … which obstructs the driver's clear view," so as to provide the officer with probable cause to believe that a violation had occurred. Accordingly, the traffic stop was justified in its inception.

It is not persuasive for Lopez to argue, as he does, that the cited statute does not prohibit placement of GPS devices on windshields, but instead "concerns the application of tint and other material to the windshield." (Doc. 46, at 1.) Contrary to defendant's assertion, section 32-5-215(a) is not restricted to window tint; rather, it expressly applies to "any sign, poster, or other nontransparent material upon the front windshield … which obstructs the driver's clear view." *Id.* Defendant cites no authority, legal principle or canon of construction that would support his attempt to equate "sign, poster, or other nontransparent material" with tint and only tint. A plain, common-sense reading of the statutory language supports a conclusion that a windshield-mounted GPS device can qualify as a "sign, poster, or other nontransparent material" that obstructs the driver's view of the roadway and therefore violates § 32-5-215(a). *See generally Alberts v. Royal Caribbean Cruises, Ltd.*, 834 F.3d 1202, 1204 (11th Cir. 2016) ("When interpreting a statute, words are to be understood in their ordinary, everyday meanings. … [O]ne should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise.") (citations and internal marks omitted).[3]

---

[3]        Scrutiny of § 32-5-215 in its entirety strongly suggests that the Alabama legislature did not use the phrase "sign, poster, or other nontransparent material" to mean window tinting alone. Subsections (d) and (e) expressly refer to "tinting" of windshields, thereby showing that the legislature was aware of the term and knew how to use it in a statute when it wished to do so. *See generally National Federation of Independent Business v. Sebelius*, 132 S.Ct. 2566, 2583, 183 L.Ed.2d 450 (2012) ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally."). Lopez's argument on this point consists of a lengthy block-quote from the Alabama Court of Criminal Appeals' decision in *J.D.I. v. State*, 77 So.3d 610 (Ala.Crim.App. 2011); however, *J.D.I.* was a cracked-windshield case, not a GPS-obstructed windshield case. The mere fact that Alabama courts have held that a windshield crack is not a "sign, poster, or other nontransparent material" within the meaning of § 32-5-215(a) does not imply that a GPS device cannot be. And nowhere in *J.D.I.* did the appellate court offer any construction of § 32-5-215(a) that might preclude its application here.

The more fundamental problem with Lopez's argument is that the legality of traffic stop does not hinge on whether the Altima was actually in violation of the Alabama windshield-obstruction law. Rather, the operative inquiry is "whether it was reasonable for an officer to suspect that the defendant's conduct was illegal. If so, there was no violation of the Fourth Amendment in the first place." *Heien*, 135 S.Ct. at 539.[4] After all, the Fourth Amendment does not require a law enforcement officer to be right 100% of the time. *See Heien*, 135 S.Ct. at 536 ("To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection.") (citation and internal quotation marks omitted). Nor does an otherwise valid stop become illegal if reasonable suspicion fails to blossom into a determination of actual criminal conduct. Reasonable suspicion is not judged through the unforgiving lens of hindsight. Deputy Kolbe clearly had reasonable suspicion to believe that the vehicle in which Lopez was travelling was in violation of the statutory requirement that the windshield must be free of any sign, poster or nontransparent material obstructing the driver's clear view of the highway. Accordingly, Lopez's Fourth Amendment rights were not trammeled when Deputy Kolbe initiated the traffic stop for violation of § 32-5-215(a).

      **B.**      ***Duration of the Traffic Stop.***

The centerpiece of Lopez's Motion to Suppress is his contention that Deputy Kolbe improperly prolonged the traffic stop in a manner that violates the Fourth Amendment, as explained by the Supreme Court in *Rodriguez v. United States*, 135 S.Ct. 1609 (2015). The rule in *Rodriguez* is succinctly framed as follows:

> "We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation."

---

[4]     *See also United States v. Harris*, 653 Fed.Appx. 709, 712 (11th Cir. June 28, 2016) (traffic stop for license plate frame obscuring decal on license plate did not violate Fourth Amendment even if frame did not actually violate Florida statute, where officer's belief of violation "was objectively reasonable in light of the statute's broad language and the lack of any settled state law at the time of Officer Grijalva's stop that precluded her belief").

*Id.* at 1612 (citation and internal marks omitted).  Lopez maintains that "*Rodriguez* required Kolbe to detain the defendant for only as long as it was necessary to conduct his duties to complete the traffic stop for having a GPS attached to the windshield" and that Deputy Kolbe violated *Rodriguez* "by extending the traffic stop by investigating crimes other than the traffic violation."  (Doc. 30 at 6.)

Defendant's position oversimplifies the rule.  It is true, of course, that when the police stop a motor vehicle, "[t]he stop's duration must be limited to the time necessary to effectuate the purpose of the stop."  *United States v. Asghedom*, 646 Fed.Appx. 830, 832 (11th Cir. Mar. 29, 2016); *see also United States v. Wilson*, --- Fed.Appx. ----, 2016 WL 5539818, *2 (11th Cir. Sept. 30, 2016) ("a traffic stop becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission").  Contrary to Lopez's stance, however, a law enforcement officer conducting a traffic stop is not duty-bound to avert his gaze from indications that other criminal wrongdoing is afoot, nor is he forbidden from taking reasonable follow-up measures to investigate reasonable suspicions.  Simply put, *Rodriguez* does not abrogate the well-settled principle that "the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring."  *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999) (citation omitted).[5]

The record reflects that Deputy Kolbe developed reasonable suspicion of illegal activity beyond the obstructed-windshield infraction beginning almost immediately when he laid eyes on the Altima.  The facts and circumstances contributing to his formation of an objectively reasonable suspicion of illegal activity included, without limitation, the following: (i) defendants' furtive activity (*i.e.*, slowing the Altima well below the speed limit, Lopez leaning back to avoid being seen, Lopez watching Deputy Kolbe's vehicle out of his visor mirror, Truitt

---

[5]     *See also United States v. Holt*, 777 F.3d 1234, 1256 (11th Cir. 2015) ("[A]n officer may prolong a traffic stop if he has articulable suspicion of other illegal activity. … Once an officer develops reasonable suspicion, he has a duty to investigate more. … A variety of factors may contribute to the formation of an objectively reasonable suspicion of illegal activity, including inconsistent statements about destination … and shaking and acting extremely nervous.") (citations and internal quotation marks omitted); *United States v. Hernandez*, 418 F.3d 1206, 1211 (11th Cir. 2005) (finding no Fourth Amendment violation where "right from the start, the Trooper had reason to suspect that he was not dealing with just a speeding case and, thus, reason to detain Defendant longer than perhaps a traffic stop, in itself, would allow.  Once the Trooper developed this reasonable suspicion, he had a duty to investigate more.").

appearing "overly aware" of his presence) before the traffic stop occurred; (ii) defendants' palpable nervousness when the stop was initiated (*i.e.*, Truitt talking excitedly and excessively, Lopez not making eye contact, Truitt breathing heavily and shaking when she handed over the rental agreement); (iii) the rental agreement's showing that the Altima had been rented four days ago in California and was due back in California the following week, even though both occupants lived in Florida; (iv) defendants' implausible travel itinerary, including inability to explain why they were driving home to Florida instead of flying even though they had to return the car to California and Lopez could fly for free because he worked for Southwest Airlines; (v) defendants' inability to explain why they had traveled to California, how long they had been there, where they had gone or what they had done; (vi) numerous inconsistencies in defendants' narratives; and (vii) continued behavior exhibiting nervousness by both Truitt and Lopez. This was a far more suspicious set of circumstances than mere nervousness. *Cf. United States v. Perkins*, 348 F.3d 965, 971 (11th Cir. 2003) ("In this Circuit, we have required more than the innocuous characteristics of nervousness, a habit of repeating questions, and an out-of-state license for giving rise to reasonable suspicion.").

These facts and circumstances not only permitted Deputy Kolbe to investigate further, but they obligated him to do so. *Rodriguez* is not to the contrary. *See Rodriguez*, 135 S.Ct. at 1615 ("An officer … may conduct certain unrelated checks during an otherwise lawful traffic stop[,] [b]ut … he may not do so in a way that prolongs the stop, ***absent the reasonable suspicion ordinarily demanded to justify detaining an individual***.") (emphasis added). Here, Deputy Kolbe developed reasonable suspicion from the inception of the traffic stop. Nothing in *Rodriguez* forbade him from detaining Lopez and Truitt on the roadside for approximately 24 minutes from the initiation of the traffic stop until the K-9 unit alerted on the Altima.[6]

---

[6]    In arguing otherwise, Lopez would liken the circumstances presented in this case to those in *United States v. Snowden*, 2015 WL 5090703 (S.D. Ala. Aug. 26, 2015), wherein Judge Granade granted a motion to suppress on *Rodriguez* grounds. But *Snowden* is readily distinguishable. In *Snowden*, the trooper conducted a traffic stop for speeding, but "found no reason to further detain Defendant" and wrote a warning citation. *Id.* at *1. After completing the warning citation, the trooper began questioning the defendant about how much money he had in his possession. Judge Granade concluded that "Trooper Roe's additional questions measurably extended the tolerable duration of the stop in such a way that violates the Fourth Amendment." *Id.* at *3. In so determining, she specifically observed that reasonable suspicion was lacking because, among other things, "Defendant provided a plausible itinerary of his travel" and "[t]his (Continued)

Accordingly, defendant's objection that Deputy Kolbe unreasonably prolonged the traffic stop in violation of *Rodriguez* is meritless.

      ***C.     Other Issues.***

In his Motion to Suppress, Lopez raises four other cursory arguments for suppression. Each may be dispatched quickly. First, Lopez objects that "[t]he seizure and search of the Nissan Maxima [*sic*] was done without warrant, reasonable suspicion and/or probable cause." (Doc. 30, at 3.) The record conclusively reflects that Deputy Kolbe and Officer McElroy did not search the vehicle until after the K-9 unit alerted to the presence of narcotic odor. That positive alert furnished probable cause for the officers to conduct a warrantless search of the Altima. *See, e.g., United States v. Trejo*, 551 Fed.Appx. 565, 568 (11th Cir. Mar. 24, 2014) ("This Court has long recognized that probable cause arises when a drug-trained canine alerts to drugs.") (citation and internal quotation marks omitted); *United States v. Nelson*, 309 Fed.Appx. 373, 375 (11th Cir. Feb. 4, 2009) ("In the case of dog sniffs, probable cause arises when a drug-trained canine alerts to drugs.") (citation and internal quotation marks omitted). As stated, there was probable cause for the initial traffic stop and reasonable suspicion to prolong the stop (and, hence, the seizure of the Altima) until the K-9 unit alerted.

Second, Lopez objects that "Deputy Kolbe did not have voluntary consent to initiate a search of the vehicle." (Doc. 30, at 4.) The Government has never asserted that defendants consented to the search. Such consent was unnecessary because the search was supported by probable cause in the form of the drug detection dog's alert to the presence of narcotic odor. In the context of this case, then, defendants' lack of consent is of no consequence.

Third, Lopez summarily states that "[t]he 'dog sniff' performed by Officer Kolbe violated of [*sic*] the Fourth Amendment." (Doc. 30, at 4.) Federal appellate courts have consistently upheld the use of dog sniffs such as that deployed here as not violative of Fourth Amendment protections. *See, e.g., Illinois v. Caballes*, 543 U.S. 405, 409-10, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) ("the use of a well-trained narcotics-detection dog … during a lawful traffics top, generally does not implicate legitimate privacy interests," and "[a] dog sniff conducted

---

is not a case where Defendant was driving a rented vehicle." *Id.* The factual differences between *Snowden* and this case are obvious and material.

during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment").[7] This objection is unavailing.

Fourth, Lopez states that "[u]pon information and belief, the dog utilized lack [*sic*] certification and training from a bona fide organization."  (Doc. 30, at 4.)  As a caveat, Lopez drops a footnote stating that he had requested, but had not yet received, records for the drug dog and handler at the time he filed his Motion to Suppress.  In response, the Government represents that Aron, the Belgian Malinois that performed the drug sniff, is certified by the National Police Canine Association, has his yearly certificate, and receives weekly training in the detection of narcotics.  (Doc. 37, at 1.)  The Reply filed by Lopez does not address any of these points, does not quarrel with the Government's representations concerning the quantum of training and reliability of Aron's performance, and does not express ongoing concerns regarding access to or contents of Aron's training and certification records.  By all appearances, this objection is no longer in play.  All information before the Court is that the requisite reliability standards are satisfied.  Certainly, defendant (despite access to applicable training/certification records) cites no facts that call into question the reliability of Aron's alert, the sufficiency of his training, or the veracity of his certification.  *See generally Florida v. Harris*, 133 S.Ct. 1050, 1058, 185 L.Ed.2d 61 (2013) ("The question – similar to every inquiry into probable cause – is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.  A sniff is up to snuff when it meets that test.").

---

[7]    *See also Holt*, 777 F.3d at 1256-57 ("during the course of a lawful traffic stop, an officer does not need any level of suspicion of criminal activity either to request a canine unit or to conduct a canine sniff"); *Wilson*, 2016 WL 5539818, at *3 ("a dog sniff that does not unreasonably prolong a traffic stop is not a search subject to the Fourth Amendment"); *United States v. Moore*, 570 Fed.Appx. 848, 850 (11th Cir. June 26, 2014) ("a dog sniff that does not unreasonably prolong the traffic stop is not a search subject to the Fourth Amendment").

**III.     Conclusion.**

For all of the foregoing reasons, defendant Joel Lopez's Motion to Suppress Evidence (doc. 30) is **denied**.

DONE and ORDERED this 24th day of January, 2017.


s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE